IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

MICHIKO NATALIE SINGH,           )        CIVIL 14-00418 LEK-RLP
                                 )
          Petitioner,            )
                                 )
     vs.                         )
                                 )
WILLIAM EDWARD PIERPONT,         )
                                 )
          Respondent.            )
_____  )


**ORDER DENYING RESPONDENT'S MOTION TO DISMISS PETITION**

          Before the Court is Respondent William Edward

Pierpont's ("Pierpont") Motion to Dismiss Petition ("Motion"),

filed on September 25, 2014.  [Dkt. no. 39.]  Petitioner

Michiko Natalie Singh ("Singh") filed her memorandum in

opposition on October 14, 2014, and Pierpont filed his reply on

October 19, 2014.  [Dkt. nos. 44, 49.]  Pierpont filed a

supplemental memorandum on October 28, 2014, and Singh filed her

response on October 31, 2014.[1]  [Dkt. nos. 57, 60.]  This matter

came on for hearing on November 3, 2014.  After careful

consideration of the Motion, supporting and opposing memoranda,

and the arguments of counsel, this Court construes Pierpont's

Motion as a motion for summary judgment.  While Pierpont makes a

strong argument for granting the Motion, the Court finds that

there are credibility determinations as to whether Singh and

_____

          [1] Singh also filed an errata to her supplemental memorandum
on October 31, 2014.  [Dkt. no. 61.]

Pierpont ever had a shared, settled intent to make Canada the family's habitual residence. Therefore, the Court DENIES the Motion, as more fully set forth below.

BACKGROUND

On September 15, 2014, Singh filed a petition seeking an order compelling her ex-husband, Pierpont, to return their minor son, W.R.P., to her in Canada, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("the Hague Convention"), as implemented by the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11603(b)[2] ("Petition"). [Dkt. no. 1.] Singh filed an amended version on September 16, 2014 ("Amended Petition").[3] [Dkt. no. 13.]

Many of the key facts in this case are not in dispute. Singh and Pierpont were married on March 12, 2010. They were living in Honolulu, Hawai`i at the time, and Singh was a musician with the Honolulu Symphony. [Pet.'s Amended Verified Decl.

_____

[2] Although the ICARA statutes were apparently reclassified in Title 22, Chapter 97, for editorial purposes, the Ninth Circuit and district courts within the Ninth Circuit continue to cite the versions in Title 42, Chapter 121. See, e.g., Murphy v. Sloan, 764 F.3d 1144, 1147 n.1 (9th Cir. 2014); Valenzuela v. Michel, 736 F.3d 1173, 1175 (9th Cir. 2013); Aguilera v. De Lara, No. CV-14-01209-PHX-DGC, 2014 WL 4204947, at *1 (D. Ariz. Aug. 25, 2014).

[3] Plaintiff filed her "2nd Amended Verified Petition for Return of Subject Child to Petitioner" ("Second Amended Petition") on September 24, 2014. [Dkt. no. 36.] On September 26, 2014, this Court issued an entering order striking the Second Amended Petition because Singh did not obtain either leave of court or a stipulation from Pierpont to file it. [Dkt. no. 41.]

Regarding International Kidnapping [sic] and Immediate Harm to the Child ("Kidnaping Decl."), filed 9/23/14 (dkt. no. 33), at ¶¶ 12-13.] W.R.P. was born in Hawai`i in July 2010. [Sealed LR100.10.2 Reference List, filed 9/15/14 (dkt. no. 4), at ¶ 1.]

Singh auditioned for and was offered a position in the Winnipeg Symphony. [Exhibits 13-66 Regarding Petitioner's Mem. of Law in Opp. to Respondent's Motion, filed 10/17/14 (dkt. no. 46) ("10/17/14 Exhibits"), Exh. 45 (9/19/11 Hawai`i Family Court Hrg. Trans. ("9/19/11 Trans.") at 79-80).] In September 2010, the family moved to Winnipeg, Canada, where they lived in a rental property. [Kidnaping Decl. at ¶¶ 15-16.] In August 2011, while the family was in Hawai`i, Pierpont served Singh with divorce papers. [Id. at ¶¶ 19, 21.] Pierpont filed the divorce action in the State of Hawai`i Family Court of the First Circuit ("Hawai`i Family Court"). See 10/17/14 Exhibits, Exh. 13 (Complaint for Divorce, filed 8/18/11). Pierpont filed a pre-decree motion seeking temporary sole legal and sole physical custody of W.R.P. [Id., Exh. 15 (Motion and Affidavit for Pre-decree Relief, filed 8/18/11).] After a hearing on September 19, 2011 ("9/19/11 Hearing"), Hawai`i Family Court Judge Paul T. Murakami orally awarded Singh temporary sole physical custody and ordered joint legal custody. The ruling allowed Singh to return to Winnipeg with W.R.P., subject to certain conditions. [9/19/11 Trans. at 147-48.] Judge Murakami

3

issued his written decision on March 22, 2012 ("3/22/12 Hawai`i

Order"). [10/17/14 Exhibits, Exh. 22 (3/22/12 Hawai`i Order).]

Both Judge Murakami's oral ruling at the hearing and the 3/22/12

Hawai`i Order invoked temporary emergency jurisdiction pursuant

to Haw. Rev. Stat. § 583-204(A). [9/19/11 Trans. at 145; 3/22/12

Hawai`i Order at ¶ 2.]

On February 4, 2013, Hawai`i Family Court Judge

Na`unanikinau Kamalii issued the Decree Granting Absolute Divorce

and Awarding Child Custody ("Divorce Decree"). [10/17/14

Exhibits, Exh. 31 (Divorce Decree).[4]]  Judge Kamalii, *inter alia*,

awarded Singh sole physical custody, subject to Pierpont's right

to reasonable visitation. [Id. at ¶ 4.] The Divorce Decree

states:

> <u>Hague Convention, Jurisdiction and Venue</u>.  The
> court finds that the child [sic] habitual
> residence for the purposes of the Hague Convention
> on International Child Abduction is the United
> States of America.  Neither party shall have the
> ability to change the habitual residence of the
> child without the written consent of the other in
> the form of a stipulated order or further order of
> the court, and no action of either parent other
> than entering into a stipulated written order
> adopted by this court as an order shall suffice to
> establish consent to or acquiescence in a change
> of the child's habitual residence in any other
> nation.  It is the intention of the court that the

---

[4] The 10/17/14 Exhibits are redacted pursuant to Local Rule
100.10.1, which governs the inclusion of personal identifiers in
filed documents.  The record also contains an unredacted version
of the Divorce Decree ("Unredacted Divorce Decree"), which is
filed under seal.  [Petitioner's Exhibits 9-11, filed 9/17/14
(dkt. no. 20) ("9/17/14 Exhibits"), Exh. 9.]

> habitual residence shall remain in the United
> States of America and that any foreign travel to
> or stay in any foreign country shall be temporary
> in nature and not result in a change of habitual
> residence.  Hawaii will also retain child custody
> modification jurisdiction under the Uniform Child
> Custody Jurisdiction and Enforcement Act (UCCJEA),
> so long as the child or at least one of the
> parties resides in Hawaii and venue shall remain
> in Honolulu, so long as at least one parent
> resides in Honolulu.

[Id. at ¶ 5.]

Pierpont filed a number of post-decree motions. Although Singh prevailed on the initial post-decree motions, Pierpont prevailed on the motion he filed on November 19, 2013. [Kidnaping Decl. at ¶ 27; 10/17/14 Exhibits, Exh. 37 (Order Granting Plaintiff's Motion for Post Decree Relief Filed 11/18/2013, filed 4/4/14 ("4/4/14 Hawai`i Order")).[5]]  On March 12, 2014, Hawai`i Family Court Judge Kevin A. Souza held an evidentiary hearing on Pierpont's November 18, 2013 motion. [10/17/14 Exhibits, Exh. 46 (3/12/14 Hawai`i Family Court Hrg. Trans. ("3/12/14 Trans.")).]  Singh was represented by counsel at the hearing, but Singh herself did not appear.  Judge Souza found her in default because Singh and her counsel knew that she would be unavailable, even by telephone, and failed to move to continue the hearing.  [Id. at 18-19.]  After hearing testimony from Pierpont, receiving exhibits from both parties, and hearing

---

[5] Pierpont's November 18, 2013 motion does not appear to be part of the record before this Court.

counsel's arguments, Judge Souza orally made findings that there had been a material change in W.R.P.'s circumstances and that it was in W.R.P.'s best interest to award sole physical custody to Pierpont, effective thirty days from the date of the hearing. [Id. at 70.]

The 4/4/14 Hawai`i Order memorialized Judge Souza's oral findings and orders at the March 12, 2014 hearing. Judge Souza found that he had continuing exclusive jurisdiction to make custody and visitation orders regarding W.R.P., pursuant to the UCCJEA, Haw. Rev. Stat. § 583-202, because the Hawai`i Family Court issued the last order regarding custody and visitation, and Pierpont resided in Hawai`i since that time. [4/4/14 Hawai`i Order at 1.] The 4/4/14 Hawai`i Order stated that, if Singh failed to return W.R.P. to the City and County of Honolulu on or before April 12, 2014,

> then [Pierpont] shall be entitled to go to his residence in Winnipeg, Canada, or wherever else the child may be found, and take possession of him. In that regard, the Royal Canadian Mounted Police, the Winnipeg Police Service, and any other law enforcement officer or agency wheresoever located, are authorized, requested and directed to assist [Pierpont] to safely and securely regain immediate possession of the child. . . .

[Id. at 3.]

On April 4, 2014, Singh filed an Application Under: The Child Custody Enforcement Act in the Queen's Bench (Family Division), Winnipeg Centre ("the Canada Family Court"), seeking

6

an order granting her primary care and control of W.R.P. ("Canada Application"). [10/17/14 Exhibits, Exh. 49 (Notice of Application).] On April 11, 2014, the Canada Family Court held a hearing on the Canada Application. Pierpont did not appear at the hearing, but he was represented by counsel. On May 6, 2014, the Canada Family Court filed an Interim Order granting Singh interim custody of W.R.P. and ordering that he remain in Winnipeg, in the Province of Manitoba, until further order of the court ("5/6/14 Canada Order"). [Petitioner's Exhibits 1-5 - Certified Copies of Canadian Court Orders, filed 9/15/14 (dkt. no. 6) ("9/15/14 Exhibits"), Exh. 3.]

On May 5, 2014, after an April 16, 2014 proceeding during which Pierpont appeared by telephone, the Canada Family Court signed an Interim Order stating that Pierpont was to have care and control of W.R.P. from May 5, 2014 at 5:00 p.m. until May 21, 2014 at 7:00 p.m., except for certain overnight periods specified in the order ("5/5/14 Canada Visitation Order"). [10/17/14 Exhibits, Exh. 57 (5/5/14 Canada Visitation Order).] Pierpont's counsel signed the order, approving its form and content. [Id. at 5.]

Pierpont does not dispute that he took W.R.P. from Canada to Hawai`i in May 2014, and W.R.P. had been living with Singh in Canada until that time. W.R.P. has remained with Pierpont in Hawai`i since May. [Mem. in Supp. of Motion at 1.]

The crux of Singh's Amended Petition is that Pierpont's removal of W.R.P. from Canada violated, and his continued retention of W.R.P. in Hawai`i violates, the Hague Convention, ICARA, and the orders of the Canada Family Court. In the instant Motion, Pierpont argues that he is entitled to dismissal of, or in the alternative, summary judgment on, the Amended Petition because: the Divorce Decree expressly found that the United States is W.R.P.'s habitual residence; W.R.P.'s habitual residence has never changed since then; and Pierpont's act of returning W.R.P. to his habitual residence is not a violation of either the Hague Convention or ICARA, regardless of the Canada Family Court's orders.

## DISCUSSION

### I.   Conversion of the Motion

Pierpont filed the instant Motion pursuant to Fed. R. Civ. P. 12(b). [Motion at 1.] As a general rule, when a district court considers a motion to dismiss, its review is limited to the allegations in the complaint. Daniels-Hall v. Nat'l Educ. Ass'n, 629 F.3d 992, 998 (9th Cir. 2010). "[A] court may consider evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." Id. (citations and internal quotation marks omitted). If the

district court considers exhibits that do not meet these requirements, it must convert the motion to dismiss into a motion for summary judgment.  Yamalov v. Bank of Am. Corp., CV. No. 10-00590 DAE-BMK, 2011 WL 1875901, at *7 n.7 (D. Hawai`i May 16, 2011) (citing Parrino v. FHP, Inc., 146 F.3d 699, 706 n.4 (9th Cir. 1998)).[6]

Singh submitted numerous exhibits with her memorandum in opposition.  See 10/17/14 Exhibits (Redacted Exhs. 14-66).  In his reply, Pierpont acknowledged that it may be necessary to convert the instant Motion into a motion for summary judgment. [Reply at 8-9.]  This Court finds that, in deciding the instant Motion, it is necessary for it to consider exhibits that are beyond the type of exhibits described in Daniels-Hall.  This Court therefore CONCLUDES that the instant Motion must be converted into a motion for summary judgment.

## II.  Singh's Hague Convention/ICARA Claim

The Ninth Circuit has recently stated that:

> The Hague Convention, which was drafted in response to concerns about "unilateral removal or retention of children by parents, guardians or close family members," seeks to prevent forum shopping in custody battles.  Mozes v. Mozes, 239 F.3d 1067, 1070-72 (9th Cir. 2001) (internal quotation marks omitted).  Under Article 3 of the Convention,

---

[6] Parrino was superseded by statute on other grounds, as stated in Abrego Abrego v. The Dow Chemical Co., 443 F.3d 676, 681-82 (9th Cir. 2006) (per curiam).

> The removal or the retention of a child is to be considered wrongful where —
>
> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was **habitually resident** immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> Convention, art. 3, 19 I.L.M. at 1501 (emphasis added). "[W]hen a child who was habitually residing in one signatory state is wrongfully removed to, or retained in, another, Article 12 provides that the latter state 'shall order the return of the child forthwith.'" Mozes, 239 F.3d at 1070 (quoting Convention, art. 12, 19 I.L.M. at 1502). . . .

Murphy v. Sloan, 764 F.3d 1144, 1149 (9th Cir. 2014) (emphasis and some alterations in Murphy). The United States and Canada are both signatories to the Hague Convention. See, e.g., Gaudin v. Remis, 282 F.3d 1178, 1182 n.1 (9th Cir. 2002) (citing 19 I.L.M. at 1501).

In opposing the Motion, Singh presents multiple arguments regarding the Hawai`i Family Court's orders, including, inter alia: Judge Murakami improperly exercised temporary emergency jurisdiction over the custody issues because he did not identify the emergency that necessitated the exercise of jurisdiction, and he did not identify a termination date for the temporary jurisdiction; even if Judge Murakami properly exercised

temporary emergency jurisdiction, it never ripened into
jurisdiction to issue permanent custody orders, and the Hawai`i
Family Court's temporary jurisdiction must yield to the custody
proceedings in the Canada Family Court; Judge Kamalii improperly
declared the United States to be W.R.P.'s habitual residence for
purposes of the Hague Convention because there was no Hague
Convention/ICARA issue in the divorce proceedings; Judge Kamalii
improperly attempted to dictate the only manner in which W.R.P.'s
habitual residence could be changed; Judge Souza issued the
4/4/14 Hawai`i Order without Singh's attendance at the hearing
and after finding her in default; and Judge Souza had notice of
the custody proceedings in the Canada Family Court before he
issued the 4/4/14 Hawai`i Order, but he never attempted to
contact the Canada Family Court.

        In addition, Singh emphasizes that Pierpont has fully
participated in the custody proceedings before the Canada Family
Court.  He has been represented by Canadian counsel and, in
addition to responding to Singh's filings, he has filed motions
seeking affirmative relief from the Canada Family Court.  Singh
argues that, when Pierpont removed W.R.P. from Canada, he
violated the visitation terms that he agreed to in the 5/5/14
Canada Visitation Order.  She also emphasizes that the Canada
Family Court held a full jurisdictional hearing and ultimately
found that W.R.P. had a real and substantial connection to

Manitoba, and did not have such a connection to Hawai`i. [10/17/14 Exhibits, Exh. 64 ("5/29/14 Canada Judgment").] On June 3, 2014, it ordered Pierpont to return W.R.P. to Manitoba, at Pierpont's expense ("6/3/14 Canada Order"). [Id., Exh. 65.]

The majority of Singh's arguments focus on the issue of whether Pierpont's removal and retention of W.R.P. are "in breach of rights of custody attributed to" her. See Hague Convention, art. 3, § a. However, this Court must determine whether there was a breach according to the laws of the country where W.R.P. "was habitually resident immediately before the removal." See id. Further, the parties agree that retaining a child in his state of habitual residence does not violate the Hague Convention. See Mem. in Supp. of Motion at 7 (citing Barzilay v. Barzilay, 600 F.3d 912 (8th Cir. 2010); Redmond v. Redmond, 724 F.3d 729 (7th Cir. 2013)); Mem. in Opp. at 11 (also citing Barzilay). In Barzilay, which involved an appeal from the dismissal of a Hague Convention/ICARA petition, the Eighth Circuit stated that the "case turn[ed] on the determination of the children's habitual residence, for the retention of a child in the state of its habitual residence is not wrongful under the Convention." 600 F.3d 912 at 917 (citation omitted).

Thus, as a threshold matter, this Court must determine where W.R.P.'s habitual residence was at the time Pierpont removed him from Canada.

**A.    Applicable Law Regarding Habitual Residence**

ICARA does not define the term "habitual residence."
See 42 U.S.C. § 11602 (ICARA definitions).  "Habitual residence
is a term of art that the Hague Convention has left intentionally
undefined to permit flexibility in its application."  Brosselin
v. Harless, No. C11-1853MJP, 2011 WL 6130419, at *1 (W.D. Wash.
Dec. 8, 2011) (citing Holder v. Holder, 392 F.3d 1009, 1015 (9th
Cir. 2004)).

Pierpont emphasizes that the Divorce Decree is the only
court order that addresses the issue of W.R.P.'s habitual
residence, and he argues that this Court must accept
Judge Kamalii's finding that the United States is W.R.P.'s
habitual residence under the res judicata, *i.e.* claim preclusion,
doctrine.  [Mem. in Supp. of Motion at 7.]  The Ninth Circuit,
however, has held that

> ordinary principles of claim and issue preclusion
> do not apply to claims under ICARA and the
> Convention.  See Holder v. Holder, 305 F.3d 854,
> 863-64 (9th Cir. 2002).  We noted in Holder that
> 42 U.S.C. § 11603(g)[7]
>
> > provides that federal courts adjudicating
> > Hague Convention petitions must accord full
> > faith and credit only to the judgments of
> > those state or federal courts that **actually
> > adjudicated a Hague Convention claim** in

---

[7] Section 11603(g) states: "Full faith and credit shall be
accorded by the courts of the States and the courts of the United
States to the judgment of any other such court ordering or
denying the return of a child, pursuant to the Convention, in an
action brought under this chapter."

accordance with the dictates of the
Convention and ICARA.

Id. at 864 (emphasis added).  Gaudin did not bring
her ICARA claim before the Hawaii courts; instead,
she chose to exercise her right to seek relief
under ICARA in federal court while simultaneously
pursuing other remedies in state court.  See id.
We are therefore not bound by the judgment of the
state court.

Gaudin v. Remis, 415 F.3d 1028, 1034 (9th Cir. 2005).

In the instant case, the Divorce Decree did not order

or deny the return of W.R.P., pursuant to the Hague Convention,

and there is no evidence in the record that either Singh or

Pierpont raised a Hague Convention/ICARA claim during the divorce

proceedings.  Thus, there is no genuine dispute of material fact

regarding whether the Hawai`i Family Court actually adjudicated a

Hague Convention/ICARA claim during the divorce proceedings.

This Court concludes that, as a matter of law under Gaudin, it is

not bound by the habitual residence finding in the Divorce

Decree.  See Fed. R. Civ. P. 56(a) ("The court shall grant

summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to

judgment as a matter of law.").

This Court will therefore determine W.R.P.'s habitual

residence at the time Pierpont removed him from Canada pursuant

to the following analysis set forth by the Ninth Circuit:

In giving practical application to th[e] term
[habitual residence], we are bound by the language
of the Convention, along with our decision in

14

> Mozes, which sets forth the governing framework.
>
> > To determine a child's habitual residence, we "look for the last shared, settled intent of the parents." Valenzuela v. Michel, 736 F.3d 1173, 1177 (9th Cir. 2013). Where a child has a "well-established habitual residence, simple consent to [her] presence in another forum is not usually enough to shift" the habitual residence to the new forum. Mozes, 239 F.3d at 1081. "Rather, the agreement between the parents and the circumstances surrounding it must enable the court to infer a shared intent to abandon the previous habitual residence, such as when there is effective agreement on a stay of indefinite duration." Id.

Murphy, 764 F.3d at 1150.

The Court acknowledges that the Ninth Circuit's standard also asks "whether there has been sufficient acclimatization of the child to trump" the parents' "last shared, settled intent." Murphy, 764 F.3d at 1150. The Court, however, finds that the "acclimatization" inquiry is inapplicable under the facts of this case. "To infer abandonment of a habitual residence by acclimatization, the objective facts [must] point unequivocally to [the child's] ordinary or habitual residence being in [the new country]." Id. at 1152 (alterations in Murphy) (footnote, citation, and internal quotation marks omitted). The Ninth Circuit has noted that "the acclimatization inquiry is so vague as to allow findings of habitual residence based on virtually any indication that the child has generally adjusted to life [in the new country]." Id. at 1153 n.10 (alterations in Murphy) (citation and internal quotation marks omitted).

15

W.R.P. was too young during the relevant periods to develop strong ties to a country - such as through school, extracurricular activities, or cultural observances - that would be sufficient to establish acclimatization.  Cf. id. at 1153.[8] W.R.P. was less than two months old when the family moved to Canada, little more than one year old when Pierpont filed for divorce, and less than four years old when Pierpont removed him from Canada.  There is no evidence in the record which even suggests that, at those young ages, W.R.P. developed sufficient ties to either country to trump his parents' last shared, settled intent.  This Court therefore finds that there is no genuine issue of material fact regarding acclimatization, and concludes that, as a matter of law, the acclimatization inquiry does not apply in this case.

---

[8] In the acclimatization analysis, the Ninth Circuit noted that:

> Although [the child] developed strong ties to Ireland through school, extracurricular activities, and contacts with [her mother]'s family, she also maintained broad and deep family, cultural, and developmental ties to the United States, spent Halloween, Thanksgiving, Easter and summers in the United States while living in Ireland, maintain[ed] a relationship with [her father]'s extended family, maintain[ed] a community in Mill Valley and receive[d] her dental and medical care in California while living overseas. . . .

Murphy, 764 F.3d at 1153 (some alterations in Murphy) (internal quotation marks omitted).

**B.** **Evidence Regarding W.R.P.'s Habitual Residence**

As noted *supra*, in the Background Section, it is undisputed that: Singh and Pierpont were living in Hawai`i when they married in March 2010; W.R.P. was born in Hawai`i in July 2010; the family relocated to Winnipeg, Canada in September 2010; and, while in the family was in Hawai`i in August 2011, Pierpont initiated divorce proceedings in the Hawai`i Family Court.

After being served with the divorce papers, Singh remained in Hawai`i because Pierpont was seeking full custody of W.R.P.[9] [9/19/11 Trans. at 92.] As noted *supra*, Judge Murakami awarded Singh temporary sole physical custody of W.R.P., subject to certain conditions, and this allowed Singh to return to Winnipeg with W.R.P. while the divorce proceedings were pending. The Divorce Decree awarded Singh sole physical custody, but Pierpont continued to seek post-decree relief to change the custody arrangement, and he eventually succeeded. Singh did not comply with the 4/4/14 Hawai`i Order, and instead litigated

---

[9] During the 9/19/11 Hearing, Singh admitted that, even after being served, she intended to return with W.R.P. to Canada as planned. She stated that she did not read through all of the papers and therefore did not realize that she could not do so. Pierpont apparently took W.R.P. to prevent her from boarding the flight with W.R.P. The police were called, but the parties dispute who called the police. They explained to her that there was a court order prohibiting her from leaving, and she remained in Hawai`i. [9/19/11 Trans. at 123-24, 126-27.] This Court finds that this incident is not relevant to the issue of where W.R.P.'s habitual residence was when Pierpont removed him from Canada.

custody in the Canada Family Court.  W.R.P. was living with Singh in Canada at the time of the removal in May 2014.

Based on the undisputed evidence in the record, the parties have been disputing where W.R.P. was to reside since the filing of the divorce action.  Thus, their last shared, settled intent regarding his residence, if they had one, was formed prior to the filing of the divorce action.  This Court finds that the determination of W.R.P.'s habitual residence at the time of removal depends upon the issue of whether, at any point before Pierpont filed for divorce, Singh and Pierpont had a shared, settled intent to abandon their habitual residence in the United States in favor of an indefinite stay in Canada.

Pierpont testified at the 9/19/11 Hearing that he purchased a townhouse in Honolulu in October 2002 ("the Townhouse"), and it was his principal residence from the time of purchase through the date of the hearing.  [9/19/11 Trans. at 7, 15.]  Singh moved into the Townhouse in August or September 2009. [Id. at 51.]  He retained the Townhouse in the divorce, and is currently residing there with W.R.P.  [Unredacted Divorce Decree at ¶ 19; Petitioner's Amended Verified Decl. Establishing the Habitual Residence of the Child, filed 9/23/14 (dkt. no. 32), at ¶ 2.C.]

According to Pierpont, when Singh was hired by the Winnipeg Symphony, they talked about "going to Winnipeg

temporarily for a year" to "see what it's like."[10]  [9/19/11
Trans. at 12, 15.]  However, he acknowledged that Singh's
position with the Winnipeg Symphony was "a tenured track, full-
time position."  [Id. at 62.]  When they went to Winnipeg,
Pierpont kept the Townhouse, his cars, and his boat in Hawai`i,
and all of their personal belongings remained in the Townhouse.
[Id. at 15-16.]  When they moved to Winnipeg, they flew from
Honolulu to Vancouver on round-trip tickets.  [Id. at 18-19.]

        Pierpont entered in Canada on a visitor visa, which
allowed him to remain there for six months, but did not allow him
to work, and did not give him access to public health care
benefits.  He looked for work in Canada prior to the move - in
part because seeking employment was a requirement to collect
unemployment benefits from the State of Hawai`i ("the State") -
but any employer who wanted to hire him would have had to go
through costly and time consuming requirements for him to obtain
a work permit.  Pierpont therefore was W.R.P.'s full-time care-
giver when they were in Canada.  [Id. at 16-18.]  Pierpont
collected unemployment benefits from the State throughout their
time in Winnipeg, and he was still receiving those benefits at

_____

        [10] During his testimony, Pierpont discussed two exhibits
that were emails from Singh, one stating that she thought she
could convince him to try Winnipeg for a year, and another in
which she acknowledged that he agreed to try it for a year.
[9/19/11 Trans. at 36-37.]  Those exhibits, however, do not
appear to be part of the record before this Court.

the time of the 9/19/11 Hearing.  [Id. at 61.]

        In particular, the fact that Singh and Pierpont did not
sell or rent the Townhouse during the move and kept their
possessions in the Townhouse, and the fact Pierpont collected
unemployment benefits from the State while the family was
together in Winnipeg, are strong indications that they **did not**
intend to abandon their habitual residence in Hawai`i, *i.e.* in
the United States.  However, there is some evidence in the record
which supports Singh's position that they **did** intend to abandon
their habitual residence in Hawai`i.

        Singh was born in Kitimat, British Columbia, and she
grew up there.  [Id. at 125.]  At the time of the 9/19/11 Hearing
Singh's family lived in Vancouver.  [Id. at 7.]  Singh's mother
had an aneurysm in 2003, which left her with brain damage and
paralysis on her left side.  Singh testified that every summer,
when the symphony was not working, she went back to Vancouver to
help care for her mother.  [Id. at 78.]

        According to Singh, when she auditioned for and was
hired by the Winnipeg Symphony, she and Pierpont were not
planning to get married.  She was planning to move to Canada and
raise the baby on her own.  She was supposed to start her
position in January 2010, but she could no longer travel due to
issues regarding her pregnancy.  [Id. at 79-80.]  Pierpont
acknowledged that Singh auditioned for and "won" the position in

20

December 2009, and he stated that "coincidentally . . . there were a lot of things that were aligning themselves to allow [them] . . . to try Winnipeg for a year and . . . see how it would be." [Id. at 14.] Thus, it appears from the record that, both by the time Singh and Pierpont married and by the time W.R.P. was born, they had agreed to move to Winnipeg, at least temporarily.

While they were living in Winnipeg, Singh auditioned for what she told Pierpont were higher paying symphony positions in Boston and in Ottawa, Ontario. Pierpont assumed that, if she was selected for one of those positions, they would have to move. Pierpont expressed his concerns to her about how another move would affect his attempts to seek employment or otherwise provide financially for the family. [Id. at 19-20.] According to Pierpont, Singh also wanted to audition in Los Angeles, New York, Seattle, and "most importantly in Vancouver." [Id. at 70.] He stated "[s]he'll be auditioning in Vancouver. She wants to be close to her family. Wherever the next best job is that's where she'll be auditioning." [Id. at 71.] Thus, Pierpont knew that Singh wanted to move to Canada on a permanent basis, but it is not clear whether that, by accompanying her, he was at all agreeing to a permanent move. Clearly, he had, at the very least, reservations. See Mozes, 239 F.3d at 1076-77.

On January 15, 2011, the Winnipeg Symphony renewed Singh's contract through June 2012. [Id. at 55.] Singh and Pierpont had leased their Winnipeg apartment for an initial term from September 15, 2010 to September 15, 2011. In November 2010, they extended the term for an amount of time which is unclear from the 9/19/11 Transcript, and they signed an extension to September 2012 on July 17, 2011. [Id. at 53-54, 58.]

Singh has argued that Pierpont's application for landed immigrant status - which she contends is the equivalent of a green card in the United States - is evidence that he agreed to stay in Canada permanently. This Court does not agree that Pierpont's application, standing alone, indicates that he and Singh had a shared, settled intent to remain in Canada indefinitely. Without landed immigrant status, Pierpont could not obtain employment and did not have access to public health care. The Court, however, does note that Pierpont's application was not submitted until May 2011, and Pierpont acknowledged at the 9/19/11 Hearing that he understood the application process could take twelve months or longer. Pierpont stated that Singh delayed submitting the paperwork she needed to complete as his sponsor because she was working on W.R.P.'s paperwork. [Id. at 55-56.] According to Singh, their plan was that Pierpont would care for W.R.P. until he was approximately eighteen months old, and then he would go to a babysitter so that Pierpont could work.

[Id. at 118-19.]  The timing of the application, coupled with
Singh's contract renewal and the extension of their apartment
lease are strong evidence that, even if Singh and Pierpont
initially agreed to a one-year trial period in Winnipeg, they
eventually agreed to stay in Canada for a longer period, and it
is an open question of fact as to whether they agreed to stay
indefinitely.

As to the fact that they did not rent or sell the
Townhouse in Hawai`i before the move, Singh testified that there
was no time to do so because she was recovering from the
pregnancy and birth and preparing for the move.  They planned to
return to Hawai`i in the summer of 2011 to rent it.  [Id. at 87-
88.]

At the 9/19/11 Hearing, Singh testified that Pierpont
never told her that he was not planning to return to Winnipeg;
she did not learn that he was staying in Hawai`i until he served
her with the divorce papers.  [Id. at 91-92.]  Singh has stated
that the trip to Hawai`i was a family vacation that was only
expected to last eleven days.  [Kidnaping Decl. at ¶¶ 19-21.]
Pierpont acknowledged that they bought return tickets to Canada
before they came to Hawai`i.  Singh's flight was on
August 23, 2011, and his was on September 13, 2011.  [Id. at 59-
60.]  Prior to arriving in Hawai`i, they stopped in Vancouver to
visit her family.  According to Singh, Pierpont told her family

that they were coming back to Winnipeg, and he even made arrangements for her brother to pick him up when he returned in September.  The plan was for him to remain in Hawai`i longer than Singh so that he could sell his car and boat.  [Id. at 90-91.] Singh's understanding, however, may have been a result of deception, as Pierpont served Singh with divorce papers once they returned to Hawai`i in August 2011.  [Kidnaping Decl. at ¶¶ 19-21.]

In considering Pierpont's Motion, which this Court has construed as a motion for summary judgment, this Court must construe the record in the light most favorable to Singh.  See Crowley v. Bannister, 734 F.3d 967, 976 (9th Cir. 2013) ("We review a grant of summary judgment de novo and must determine, viewing the facts in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." (citations and quotation marks omitted)). There is evidence in the record that supports Pierpont and some evidence that supports Singh.  This Court's ruling on the issue of whether Singh and Pierpont had a shared, settled intent to make Canada the family's habitual residence may depend upon a credibility determination.  Making credibility determinations is inappropriate in a motion for summary judgment.  See Bravo v. City of Santa Maria, 665 F.3d 1076, 1083 (9th Cir. 2011)

("[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." (citation and quotation marks omitted)).  This Court therefore FINDS that there are genuine issues of material fact as to the question of whether, at any time before Pierpont filed for divorce, Singh and Pierpont ever had a shared, settled intent to make Canada the family's habitual residence.  This necessarily means that there are genuine issues of material fact as to the question of what W.R.P.'s habitual residence was when Pierpont removed him from Canada.  As previously noted, this Court cannot address the parties' arguments regarding whether the removal was wrongful until this Court determines where his habitual residence was.  This Court therefore CONCLUDES that Pierpont is not entitled to summary judgment.

## CONCLUSION

On the basis of the foregoing, Pierpont's Motion to Dismiss Petition, filed September 25, 2014 - which this Court has construed as a motion for summary judgment - is HEREBY DENIED.

This Court will hold a status conference on **December 15, 2014 at 9:45 a.m.** to discuss setting the trial date and the deadlines for the parties' trial submissions.  Only the parties' counsel are required to attend the status conference. Both parties have the option of attending in person or

participating by telephone.

      IT IS SO ORDERED.

      DATED AT HONOLULU, HAWAII, November 17, 2014.



                    /s/ Leslie E. Kobayashi
                    Leslie E. Kobayashi
                    United States District Judge

**MICHIKO NATALIE SINGH VS. WILLIAM EDWARD PIERPONT; CIVIL 14-00418 LEK-RLP; ORDER DENYING RESPONDENT'S MOTION TO DISMISS PETITION**